UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| LAVALLE MARCELLE PORTER, Petitioner, v. PATRICK COVELLO, Warden, Respondent. | Case No.: 18cv2345-CAB (NLS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[ECF. No. 1]** |
|---|---|

**I.  INTRODUCTION**

Petitioner Lavelle Marcelle Porter ("Petitioner," "Porter," or "Lavelle"), a state prisoner proceeding *pro se* and *in forma pauperis*, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his San Diego Superior Court conviction for assault with a deadly weapon and battery in case number SCD263061. (ECF No. 1 at 2 ("Petition").)[1] Respondent filed an answer, arguing that Petitioner's petition fails on the merits, and lodged the court records. (ECF No. 9 ("Response"); ECF

---

[1] Due to discrepancies between original and imprinted page numbers, page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the court's electronic case filing system.

No. 10 ("Lodgment").) Petitioner filed a traverse, and the Court took the matter under submission. (ECF No. 11 ("Traverse").) After reviewing the parties' submissions and the lodgments, and for the reasons discussed below, the Court **RECOMMENDS** the Petition be **DENIED**.

## II. FACTUAL BACKGROUND

The following facts are taken from the California Court of Appeal opinion:[2]

> R.D.[3] was riding his bicycle on a San Diego trolley platform shortly after 5:00 a.m. on the morning of July 23, 2015. R.D. rode his bicycle past Porter, who had been standing by himself on the trolley platform.· As R.D. rode by Porter, Porter lunged toward R.D. Porter grabbed R.D. and caused him to fall off of his bicycle. Porter then repeatedly struck R.D. in the head with a metal object-multiple six-inch copper wires, braided together, covered in a hard plastic sheath. The object was approximately three quarters of an inch in diameter, weighed about one pound, and had "a little bit of sharpness to it."
>
> As Porter repeatedly struck R.D.'s head, R.D. said, "'Stop. What the hell are you doing that for? I don't even know you. Who are you?'" At some point, R.D. fell to his hands and knees, and Porter continued to strike R.D.
>
> The video surveillance system at the trolley station recorded the attack. In addition, a police officer who was in his patrol car nearby witnessed the attack and identified Porter as the aggressor. The officer quickly approached R.D., who was bleeding and appeared to be injured and in pain. R.D. pointed at Porter, who was standing nearby, and said to the officer, "'That guy,' . . . 'Beat him up.'" The police officer called for medical assistance, waited for additional officers or paramedics to arrive,

---

[2] This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *Slovik v. Yates*, 545 F.3d 1181, 1183 n.1 (9th Cir. 2008); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness). Here, Petitioner does not raise a challenge to any of these facts.

[3] The appellate court used the initials "R.D." to refer to the victim, Robert Duncan. He will also be referred to as Mr. Duncan in this order.

and then went to speak with Porter.

    The police officer who spoke with Porter initially found him to be not "very responsive." The officer believed that Porter was either "under the influence of a controlled substance," or possibly having "a psychotic break," such that the officer became somewhat concerned about his own safety. The officer saw that Porter was holding an object in his hand, and repeatedly asked Porter to put the object down. Porter did not respond and did not comply. The officer eventually returned to his car to retrieve his police dog because he continued to be concerned for his own safety. The officer then approached Porter and "push[ed]" him, which seemed to "jog[] his memory." After the officer pushed him, Porter began to comply. The officer was able to ascertain that Porter was holding a "six-inch copper wire, about three quarters [of an inch] in diameter, with a plastic sheathing around it." The wire object appeared to be the instrument with which Porter had attacked R.D. The officer arrested appellant for assault with a deadly weapon.

    As a result of the attack, R.D. suffered a deep laceration and a circular contusion on the top of his head. The wound on top of his head reached the deeper layers of connective tissue and muscle, and required a deep suture, which is a permanent suture underneath the skin. R.D. also suffered some bruising on his back, along his ribs.

(ECF No. 6 at 2-4.)

## III. PROCEDURAL BACKGROUND

### A. Trial Court Proceedings

Petitioner was initially charged on July 27, 2015. (Lodgment No. 6 at 1-5.) Petitioner was subsequently charged by two amended informations, the latter of which charged him with assault with a deadly weapon (Cal. Penal Code § 245(a)(1)) and battery with serious bodily injury (Cal. Penal Code § 243(D)). (*Id.* at 40-44.) The State also alleged that in the commission and attempted commission of the offenses, Petitioner personally used a dangerous and deadly weapon (within the meaning of Cal. Penal Code § 1192.7(c)(23)), personally inflicted great bodily injury upon R.D. (within the meaning of Cal. Penal Code §§ 1192.7(c)(8), 12022.7(a)). (*Id.* at 41.) The State further alleged that Petitioner had been previously convicted of more than two felonies (within the

3

meaning of Cal. Penal Code § 1203(e)(4)), and that he had a prior conviction which constituted a strike (under Cal. Penal Code §§ 667(b)-(i), 668, 1170.12). (*Id.* at 42-44.)

On January 12, 2016, a jury convicted Petitioner of both assault with a deadly weapon and the lesser included offense of battery, and found true the accompanying allegations. (Lodgment 8-1 at 412-14.) In a bifurcated proceeding, the jury also found that Petitioner served four prior prison terms, had a prior serious felony conviction, and had a prior strike conviction. (Lodgment 8-2 at 446-47.)

On March 8, 2016, the trial court sentenced Petitioner to 19 years in state prison. (Lodgment 8-3 at 461.) There, the trial court sentenced Petitioner to eight years for the assault with a deadly weapon (upper term of four years, doubled under the Three Strikes law for prior strike conviction), three years for the inflicting great bodily harm enhancement, five years for the prior serious felony conviction enhancement, and an addition of three years for Petitioner's prison priors.[4] (*Id.*; *see also* Lodgment 6 at 214-30.)

B.   **Direct Appeal**

On September 28, 2016, Petitioner filed for appeal. (Lodgment No. 1 at 13.) In his direct appeal, Petitioner claimed that the trial court erred by excluding the recording of 911 calls that he had made on July 5, 2015, where he reported that he was being followed and threatened by men at the same trolley stop where the assault took place. (*Id.* at 21-40.) Petitioner argued that this evidence was relevant because it goes to his claim of self-defense and that his conviction should be reversed. (*Id.*) On May 8, 2017, the California Court of Appeals rejected the argument and affirmed the conviction. (ECF No. 6 at 45-57.)

On June 15, 2017, Petitioner sought review from the California Supreme Court.

---

[4] Though the jury found that Petitioner sustained four prison priors, the Court exercised its discretion to strike one of the priors, which also served as the underlying conviction for the Three Strikes enhancement. (Lodgment 8-3 at 461.) Thus, the Court added three years—one for each of the remaining prison priors. (*Id.*)

(Lodgment No. 2.) There, he raised the same issue regarding the exclusion of the 911 calls. (*Id.*) The California Supreme Court issued an order summarily denying review on July 26, 2017. (Lodgment No. 3.)

### C. Federal Habeas Proceedings

On October 11, 2018, Petitioner filed the instant federal petition for writ of habeas corpus in this Court. (Petition at 1.)

## IV. STANDARD OF REVIEW

Petitioner's petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. As long as neither the reasoning nor the result of the state court decision

contradicts Supreme Court precedent, the decision will not be "contrary to" clearly established federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003)

The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Bell*, 535 U.S. at 694. The "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer*, 538 U.S. at 75. "[A] habeas court [must] determine what arguments or theories supported, or could have supported, the state-court decision and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with a prior decision of [the Supreme Court]." *Harrington v. Richter*, 562 U.S. 86, 88 (2011). This is an extremely deferential review, posing a heavy burden on the Petitioner: to prove that the state court's ruling on the claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

To determine if a decision was based on an unreasonable determination of the facts in light of the evidence presented, the state court's factual findings are presumed correct and this presumption will not be overturned on factual grounds unless this Court finds that the factual determinations were objectively unreasonable in light of the evidence presented in state court. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). Petitioner may overcome that presumption only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). A state

court decision is only considered objectively unreasonable when it is "more than incorrect or erroneous." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst*, 501 U.S. at 805-06. If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

## V. DISCUSSION

In this federal habeas petition, the only issue raised by Petitioner is the same issue previously raised regarding the exclusion of the 911 calls.

### a. Relevant Background

During trial, Petitioner's counsel requested a court order so that she could obtain Petitioner's phone records during the month of July 2015 to check for 911 calls.[5] (Lodgment 8-1 at 188-190.) With the aid of the prosecution counsel, the parties uncovered several phone calls to 911 made in July 2015, three of which are relevant to the issues here.[6]

The records showed that Petitioner made three calls to 911 on July 5, 2015, lasting

---

[5] This issue was raised by Petitioner in a discovery request prior to trial, but it appears he asked for 911 calls made from his phone number in April, May, and June of 2015. (Lodgment 8-1 at 196-97.) The prosecution counsel checked but none were recovered during that timeframe. (*Id.*)

[6] There is some discrepancy in the record on whether two calls or three calls were made on July 5, 2015, the relevant date. (*Compare* ECF No. 6 at 49 *with* Lodgment 8-1 at 224.) The other call, made on July 9, 2015 appears to involve an unrelated domestic disturbance issue with Petitioner's girlfriend. (Lodgment 8-1 at 198.)

about 11-12 minutes total. (*Id.* at 198.) The calls were played in court outside the presence of the jury. (*Id.* at 224.) The calls were not transcribed so the Court relies on the Court of Appeal's factual description of the 911 calls, which were presented to that court for the appeal on a computer disk of audio recordings:[7]

> During the series of three calls, which occurred between 1:30 and 1:48 p.m., Porter told dispatchers that a group or groups of people were following and/or bothering him. For example, in the first call, Porter reported that he was on a trolley that was stopped at the Santa Fe trolley station and that there were "a lot of males moving around me." He continued, "Nah, they're moving up on me in a stealthful manner as if they're trying to ambush me. . . . They moving around me all weird." The dispatcher asked if he needed police contact, to which he responded, "Yeah." Porter indicated to the dispatcher that the men looked Hispanic, and said that he could not say how many there were. Porter became agitated with the dispatcher and continued to talk over her as she attempted to ask him questions. He told the dispatcher that he had not been drinking or using drugs that day, but then said that he had "been up all night," and that he could not "even go to sleep." The dispatcher ended the call after telling Porter that she would have someone contact him.
>
> In a second call, recorded at 1:37 p.m., Porter can be heard saying, "There's people moving around me in a manner in which it look like they gonna try to put their hands on me." He indicated that he was "at the C street trolley," at "Fifth Avenue." "They trying to creep on me." He told the dispatcher that the people were "just trying to hurt me." He explained that he knew this "because of how they're moving around me." Porter contended that there were approximately six people around him. When the dispatcher asked Porter whether the people had threatened him, he responded that they were "moving around [him]." He said that he did not "let nobody get near [him]," even though they were "walking all around." He contended that the people were "trying to hide behind a little thing right here the little metal thing." Porter told the dispatcher that the people "got weapons," including "knives," "on their pockets." The dispatcher told Porter that she would have someone "check the area."

---

[7] As previously noted, this Court gives deference to state court findings of fact and presumes them to be correct, particularly where they are unchallenged as here. *Slovik*, 545 F.3d at 1183 n.1.

> During the third call, at 1:48 p.m., Porter can be heard mumbling, but it is not clear what he is saying at the beginning of the call. When he subsequently began speaking clearly, Porter said to the dispatcher, "Yes, I am being surrounded by people and look like they're gonna to try to jump on me." He continued, "And I'm not trying, I'm not trying to get into it with nobody, that's all." This time he told the dispatcher that approximately 20 people were "trying to jump [him]." He asserted that the people were "black, Hispanic, all colors, white." Although he stated that he believed that the people were armed with knives, he conceded that no one had threatened him with a knife. The dispatcher told Porter that she would let "someone know" and said, "They'll be out there as soon as they can."

(ECF No. 6 at 49-51.)

In addition, during trial, the prosecution attorney obtained the computer-aided dispatch ("C.A.D.") which included notes stating "Trolley sec [security] has visual on camera. Male is sitting alone, looks paranoid, looking around, talking to himself/holding blk swtr [black sweater] in his hand. Poss in white t-shirt with lettering on the back. . . . On the back/other subjs [subjects] sitting far from male." (Lodgment 8-1 at 198-99.)

During trial, Petitioner's counsel argued that the calls should be admitted as they go to his state of mind at the time the assault took place and would be a basis for his self-defense claim. (*Id.* at 201, 224.) Prosecution counsel argued that the timing of the calls was too far removed and, regardless, that the content of the calls do not show that Petitioner was actually being threatened on that date. (*Id.* at 225-226.) After hearing the tapes and arguments, the Court reserved final ruling on the pending defense testimony, but tentatively ruled:

> Well, at this juncture, the court is not going to be allowing the 911 tapes to come in. I don't know if the defense is planning on present [sic] any witnesses. I don't know if Mr. Porter is planning to testify. After the defense presents any other evidence it plans to present, then I'll re-visit the issue if its seems – if the defense wants to.
>
> But at this juncture, there's nothing that even links the July 5th calls to the events of July 23rd. So that's my ruling at this time.

(*Id.* at 226-27.)

Subsequently, after Petitioner testified and both sides rested, the Court made its final ruling:

> So yesterday I ruled, when the request was originally made, that I would not allow the 911 but I would consider any requests after Mr. Porter testified to determine if I thought, at that point, it was relevant.
>
> My ruling still remains the same in that based on his testimony, I feel that admission of the 911 tape relating to the July 5th incident is, no. 1, not relevant; and, no. 2, even if relevant under 352, would be confusing and engage in a consumption of undue time.
>
> So for those reasons, the ruling I previously made remains.

(*Id.* at 398-99.)

Petitioner appealed this issue to the California Court of Appeal and the California Supreme Court. Because the California Supreme Court summarily denied the petition, the Court looks through to the last reasoned opinion, that of the California Court of Appeal. That court found that the exclusion of the 911 calls was not an abuse of discretion because they were not relevant:

> The 911 calls that Porter sought to admit occurred 18 days prior to his unprovoked attack on R.D. Further, the prosecutor proffered that Porter's 911 calls would not provide evidence that Porter reasonably believed that he was actually in any danger, even at the time he made them, given the CAD notes indicating that at the time Porter placed the calls, he was "sitting alone . . . talking to himself," and appeared to be "paranoid."[5] Thus, the fact that Porter made these 911 calls and may have unreasonably believed that he was being followed by a group of men on July 5th does not tend to demonstrate that he held a reasonable belief that he had to defend himself against the victim, who did not speak to or otherwise communicate with Porter, 18 days later. The trial court therefore acted well within its discretion in concluding that the 911 calls were not relevant to Porter's self-defense theory.
>
> . . .
>
> [5] Porter's responses to the 911 dispatcher also cast doubt on the existence of any real threat to him on the day he placed the calls. He acknowledged, when asked, that the group of men he was ostensibly calling in reference to had neither spoken to him nor threatened him.

10

(ECF No. 6 at 55.) The court continued:

> Further, even if one were to conclude that the 911 calls had some minimal relevance, the trial court acted well within its discretion in excluding the calls under section 352. "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) As we have explained, we doubt that this evidence had any probative value, but even if one were to conclude otherwise, it is nevertheless clear that any probative value would be exceedingly minimal. The trial court thus did not abuse its discretion in determining that any minimal probative value of this evidence would have been outweighed by the amount of time it would have taken to play the recordings of the calls and to present other evidence to provide further context, or to present evidence to challenge the weight to be given to the recordings, as well as the potential for juror confusion arising from the introduction of the calls.

(*Id.* at 565-56.)

### b. Analysis

It is well-established that errors in state court evidentiary rulings cannot serve as a basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (holding same). Rather, "a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process." *Spivey v. Rocha*, 194 F.3d 971, 977 (9th Cir. 1999); *Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir. 2008) ("The correctness of the trial court's evidentiary ruling as a matter of state law is irrelevant to our review, because a federal court may entertain an application for a writ of habeas corpus 'only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States.'"). Thus, Petitioner cannot be granted habeas relief simply by arguing that the trial court's exclusion of the 911 calls

was in violation of California Evidence Code § 352.[8]

The Constitution does guarantee that a criminal defendant must have a meaningful opportunity to present evidence in his defense at trial. *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). This is not an unfettered right, and states can place limits on what kind of evidence is permitted. *Taylor*, 484 U.S. at 410 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("The accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.").

Specifically, rules that balance the "probative value" against "other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury" generally do not offend the Constitution. *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) (noting that rules like the Federal Rule of Evidence 403, among other model rules, are well-established as constitutional and permit trial courts to perform balancing tests); *see also Crane*, 476 U.S. at 689-90 ("[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'") (citation omitted); *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (including Rule 403 as one of "any number of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of relevant evidence").

The Ninth Circuit in *Moses v. Payne*, 555 F.3d 742 (9th Cir. 2009), analyzed a similar state evidence rule under this legal framework. There, the petitioner challenged

---

[8] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Cal. Evid. Code § 352.

12

on habeas petition the exclusion of evidence under Washington state evidence rule 702, which "admits expert testimony if it will assist the trier of fact to understand the evidence or fact at issue." *Id.* at 756. First, the court considered the constitutionality of the Rule, on its face. After discussing several Supreme Court cases where evidentiary rules were struck down as constitutional violations, the court explained why the rule before it was different: "The evidentiary rules in those cases, by their terms, required the trial court to exclude crucial evidence that had a critical effect on the trial, with little or no rational justification. In general, the rules precluded a defendant from testifying, excluded testimony from key percipient witnesses, or excluded the introduction of all evidence relating to a crucial defense. In contrast, Rule 702 does not require a trial court to exclude evidence. Rather, it authorizes a court to admit expert testimony 'if it will assist the trier of fact to understand the evidence or a fact in issue.'" *Id.* at 758. Thus, the court concluded that its rule was more akin to those that were discussed with approval in *Holmes*.

Next, in *Moses,* the Ninth Circuit considered the argument that the trial court's exercise of discretion in applying the state evidence rule formed the basis of the habeas petition. 555 F.3d at 758. However, the court held that the Supreme Court cases have all "focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence" and did not "squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence." *Id.* In addition, the court found that while there was a Ninth Circuit case outlining the test where a trial court's exercise of discretion to exclude evidence under an otherwise valid evidentiary rule might violate a defendant's rights, this does not serve to satisfy the "clearly established" federal law under AEDPA because it was not Supreme Court law. *Id.* (quoting *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003)). Thus, under this scenario as well, the *Moses* court found that the habeas petition failed.

The same holds true for California Evidence Code § 352. This rule is essentially

the state rule counterpart to Federal Rule of Evidence 403. It does not require the exclusion of evidence but only permits the trial court to weigh the evidence against other factors that express legitimate state concerns. As such, various district courts have held that Rule 352 does not violate the Constitution on its face and cannot form the basis for habeas relief. *See, e.g.*, *Mendez v. Biter*, No. C 10-5555 PJH PR, 2013 WL 843554, at *15 (N.D. Cal. Mar. 6, 2013) ("[P]etitioner's impeachment evidence was excluded under section 352 of the California Evidence Code, a well-established rule of evidence that permits a court to exercise its discretion in admitting testimony. The rule does not, in and of itself, abridge a defendant's right to present a defense. Because the Supreme Court has not squarely addressed the issue whether a trial court's exercise of its discretion in this context violated a defendant's constitutional right to present a defense, petitioner is not entitled to federal habeas relief.") (citation omitted); *Smith v. Marshall*, No. EDCV 09-886 PSG FFM, 2012 WL 1440612, at *11 (C.D. Cal. Mar. 26, 2012) ("Pursuant to California law, a decision to exclude evidence under California Evidence Code section 352 necessarily involves the exercise of discretion. Indeed, it requires the trial court to balance the evidence's probative value versus its potential to cause prejudice, confusion, and undue consumption of time. Because no Supreme Court case has squarely held that the exclusion of evidence under these circumstances violates a criminal defendant's right to present a defense, the state court's holding could not have been an unreasonable application of clearly established federal law as determined by the Supreme Court."); *Balderrama v. Scribner*, No. CV06-7401-PSG MAN, 2010 WL 1051110, at *6 (C.D. Cal. Feb. 9, 2010) ("Thus, a rule such as that set forth in California Evidence Code § 352 may be applied, consistently with the Constitution, to exclude relevant evidence sought to be introduced as part of the defense case."); *Bonaparte v. Soto*, No. 14CV2725-WQH (RBB), 2015 WL 11023216, at *9-10 (S.D. Cal. Dec. 18, 2015); *Gutierrez v. Swarthout*, No. 1:10-CV-01014-LJO, 2012 WL 5210107, at *27 (E.D. Cal. Oct. 22, 2012).

However, even if the Supreme Court's general due process standard were considered to be "clearly established" law governing trial court discretionary decisions

concerning the exclusion of testimony, Petitioner has not shown that the trial court's decision in the present case was contrary to, or an unreasonable application of, clearly established federal law. *See Spivey*, 194 F.3d at 977-78 ("It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process"). The trial court did not apply Rule 352 in an arbitrary manner; rather, the trial court heard argument and testimony and concluded that there was not sufficient evidence to link the 911 calls to the assault, taking place over two weeks later. Petitioner himself testified that he was not aware of the alleged link between Mr. Duncan to the prior incident on July 5 at the time of the July 23rd attack and only made the connection *after* the attack occurred. (*See* Lodgment 8-1 at 239 ("The first time that I became aware of actually who Mr. Duncan was after the incident, once I got the police report, and then I positively recognized Mr. Duncan as one of the individuals that has surrounded me and tried to attack me prior at the exact same bus stop."); *id.* at 299 ("And I didn't know it was him until after I reviewed the information in the discovery and seen a picture of him. I didn't know who he was, but once I seen the gentleman, I positively identified him as one of the individuals."); *id.* at 304 ("It didn't become apparent to me until I became the attorney of record and then I got the discovery. Once I got the discovery, then I looked at the photos, and then I recognized him as the individual – one of the individuals who were there.").)

In addition, while self-defense is to be considered from the viewpoint of the defendant and the danger to the defendant did not have to actually exist, that belief has to be "reasonable," judging from the viewpoint of what "a reasonable person in a similar situation with similar knowledge would have believed." CALCRIM 3470. The state appellate court found that evidence surrounding 911 calls tended to show that Petitioner was alone, talking to himself and paranoid, and even admitted to 911 dispatch that the group of men had not talked to him or threatened him. Thus, the appellate court found that his belief about being in danger was "unreasonabl[e] and did "not tend to demonstrate that he held a reasonable belief that he had to defend himself against the

15

victim, who did not speak to or otherwise communicate with Porter, 18 days later." (ECF No. 6 at 55.) Even if the calls may have had some minimal relevance, the appellate court held that whatever minimal relevance would be outweighed by the time it would take to play the calls and to present other evidence to provide further context or potential jury confusion caused by playing the calls. (*Id.* at 56.) Further, as Respondent points out, there was other evidence presented going to Petitioner's guilt, including Mr. Duncan's testimony at trial and the video of the assault itself. Thus, this one decision regarding the 911 calls did not render the totality of the state proceedings fundamentally unfair, and was not a contrary or unreasonable application of federal law.

Petitioner argues that the strength of the evidence against him only appears "great" because 911 calls were excluded. ECF No. 11 at 9-10. However, a review of the record indicates that even though the calls themselves were not admitted, the jury would have been aware of the 911 calls through Petitioner's own testimony and attorney argument. Petitioner provided some testimony that was not stricken, alluding to the prior 911 calls being made on July 5 and his claim of self-defense. Petitioner testified that he believed Mr. Duncan had tried to attack him on a prior date. (Lodgment 8-1 at 239-40 ("**Q**: Okay. So you're saying that Mr. Duncan, on a previous occasion previous to July 23rd, had tried to attack you? **A**: Yes, ma'am."). Petitioner continued on to testify:

> **Q.** . . . So let me ask you this: the very first time you saw Mr. Duncan as it relates to lights – was it when he was approaching you or was it a time prior to this on July 23rd?
>
> **A.** The first time I seen Mr. Duncan was prior to this. I seen Mr. Duncan – he was only of the individuals who has surround me that day on – I think it was the – the district attorney and you guys can keep me on point. I believe it was July 5th that I made the 911 call.

(*Id.* at 299.) This was followed by this next line of questioning:

> **Q.** Okay. You've made mention a couple of times on cross-examination that you've made calls to the police –
>
> **A.** Yes.

**Q.** – from this same exact location?

**A.** Yes, ma'am.

. . .

**Q.** Have you ever felt that your life was in danger at 500 'C' street as it relates to Mr. Duncan and anything he's done?

**A.** Yes, ma'am.

**Q.** How so?

**A.** Mr. Duncan was part of the group of individuals on, I believe, July 5th when I called 911. He was one of the people that I positively identified as being those ones who surrounded me and was whistling. They were trying to surround me and make – and basically they were trying to pin me and harm me.

He was one of them. I remember him because of his beard. I remember – not the beard, but the mustache. He has a mustache. And I remember the mustache and also remember his fat little fingers. He has little fat fingers. He had on a red shirt and some black – a red shirt and some black shorts.

And it was like 1:00 – 1:30, 2:00 in the afternoon, so I seem him clearly. It's just at the time, I didn't know who he was.

**Q.** Okay. And so this happened on July 5th with Mr. Duncan?

**A.** Yes, ma'am.

(*Id.* at 303-04.) The trial court gave the self-defense jury instruction and Petitioner's counsel argued this during closing arguments:

> I would like for you to consider these words because they are also in the instruction and it is very important: When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant. That is Mr. Porter.
>
> Everything that he relayed to us about being at 500 'C' street, about being there previous times and calling 911, in fear of his life, in fear of something happening to him, and then just that very day, moments before this light is coming towards his, as he said, being blinded – he was just trailed and followed by a group of men – the circumstances as they were known to and

17

appeared to him.

> And then you consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. That is something [prosecution counsel] did not discuss with you.
>
> Because even if the danger did not actually really exist but because of the circumstances and what Mr. Porter knew to be his reality, that is all that is necessary to carry the day for his right to defend himself.

(*Id.* at 367.) Thus, contrary to Petitioner's contentions, the jury heard this testimony and did have some opportunity to take it into consideration as part of his self-defense claim.

Furthermore, upon review of the record, the state court's factual findings are not objectively unreasonable in light of the evidence presented in court, as discussed above. *See Miller-El*, 537 U.S. at 340. Accordingly, for all of the foregoing reasons, the Court recommends that Petitioner's habeas petition be **DENIED**.

## VI. CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Cathy Ann Bencivengo under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California. In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that any party to this action may file written objections with the Court and serve a copy on all parties no later than **April 3, 2019**. The document should be captioned "Objections to Report and Recommendation."

//
//
//
//
//

**IT IS FURTHER ORDERED** that any Reply to the Objections shall be filed with the Court and served on all parties no later than **April 17, 2019**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

Dated: March 12, 2019

*/s/ Nita L. Stormes*
Hon. Nita L. Stormes
United States Magistrate Judge